UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JESUS GUERRA,

                              Plaintiff,

        -against-                                    1:15-CV-1168 (LEK/TWD)

PATRICK MURPHY,
Acting Secretary, Department of the Army

                              Defendant.
_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Plaintiff Jesus Guerra commenced this action against defendant Patrick Murphy, Acting

Secretary, Department of the Army, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, alleging

discrimination on the basis of race and national origin and retaliation for engaging in activity

protected by Title VII. Dkt. No. 1 ("Complaint") at 1–2; Dkt. No. 15 ("Amended Complaint")

at 1–2. Presently before the Court is Murphy's Motion to Dismiss the Amended Complaint. Dkt.

No. 20 ("Motion"); see also Dkt. No. 20-1 ("Memorandum"). Guerra opposes the Motion, Dkt.

No. 21 ("Response"), and Murphy filed a reply, Dkt. No. 24 ("Reply"). For the reasons that

follow, the Court grants Murphy's Motion.

## II.  BACKGROUND[1]

### A.  Factual History

Guerra is a "Hispanic male of Cuban descent" who resides in Saratoga County, New York. Am. Compl. ¶¶ 7, 9. Guerra began working for the Department of the Army at Watervliet Arsenal on November 5, 2007. Id. ¶ 10. In his Amended Complaint, Guerra fails to specify the position he held at the Watervliet Arsenal, although in a document filed by Murphy, Guerra's title is given as "Maintenance Mechanic Leader." Dkt. No. 20-8 ("Exhibit E"). Until 2010, Guerra experienced "a generally enjoyable work environment free from discrimination." Am. Compl. ¶ 11. Guerra recites several incidents beginning in May 2011 that allegedly show the unlawful discrimination he has suffered at the hands of his employer.

Sometime in May 2011, Guerra and Donald Gibbs, a "supervisor," were standing in a parking lot. Id. ¶ 12. Leonard Oddy, an "acting supervisor," screamed at Guerra and "used profanity." Id. Although Guerra's supervisor, Thomas Herold, learned of the incident, he failed to do anything about it. Id. Oddy never yelled or cursed at Caucasian employees who held the same position as Guerra. Id. Specifically, Guerra states that he never saw Oddy give the same sort of treatment to Brett Hurry, a Caucasian "Electrical shop working leader." Id. On May 2, 2011, Herold "failed to acknowledge Mr. Guerra as a work leader during a meeting with his coworkers." Id. ¶ 13. According to Guerra, Herold "always acknowledged Caucasian work

---

[1]  Because this case is before the Court on a motion to dismiss for failure to state a claim, the allegations of the Amended Complaint are accepted as true and form the basis of this section. E.g., Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her favor").

leaders." Id. In particular, Herold always acknowledged as work leaders Hurry and Oddy, both of whom are Caucasian. Id.

On October 18, 2011, Guerra emailed Herold about issues he had been having with Oddy and Aaron Orologio. Id. ¶ 14. Herold responded to this email on November 14, 2011, but his response did not satisfy Guerra. Id.

On April 27, 2012, Guerra attended a meeting with Herold and Gibbs to deal with "ongoing work issues." Id. ¶ 15. At the meeting, Herold said to Guerra, "[M]aybe it's time for a career change." Id. Guerra states that to his knowledge, Herold never told Oddy or Hurry to consider changing careers. Id. On May 18, 2012, Herold "permitted Mr. Oddy and Mr. Orologio to totally disregard the Plaintiff[']s authority as work leader of Roads during a safety meeting which concerned plans for roads and grounds personnel," something Herold had never done with respect to a Caucasian employee. Id. ¶ 16. On May 29, 2012, with Herold present, Oddy "verbally reprimanded and questioned Mr. Guerra in a hostile tone for requesting personnel from another shop to assist with the containment of bees." Id. ¶ 17. Guerra, who had seen Oddy interact on many occasions with Hurry, never saw Oddy engage in this type of conduct toward Hurry. Id. On June 19, 2012, Herold "verbally counseled" Guerra about work assignments that belonged to Oddy and Orologio. Id. ¶ 18. Again, to Guerra's knowledge, Herold never counseled Hurry or Oddy about work assignments that belonged to other employees. Id.

Herold refused to allow Guerra to "create service orders," though Oddy and Hurry were allowed to do so. Id. ¶ 19. Herold also refused to give Guerra keys to either Herold's or Guerra's office[2] despite the fact that Hurry and Oddy received keys to the office from Herold. Id. ¶ 20.

On May 9, 2013, "a second line supervisor" named David Rowe told Guerra that "while the grounds looked great . . . he should slow down because he has no summer hires." Id. ¶ 21. To Guerra's knowledge, Rowe never told Hurry or Oddy to slow down for that reason. Id. On July 11, 2013, Brad Frasco, a coworker of Guerra's, cursed at Guerra in front of Gibbs, the supervisor. Id. ¶ 22. Seemingly acknowledging that this behavior was inappropriate, Frasco apologized to Gibbs. Id. Yet Frasco never apologized to Guerra, and Frasco was not disciplined for his conduct. Id. Guerra is not aware of any instances in which Frasco cursed at Hurry or Oddy. Id. On July 16, 2013, Frasco cursed at Guerra again, but this time Herold was there. Id. ¶ 23. That same day, Herold told Chief Al Columbus about Frasco's behavior toward Guerra. Id. ¶ 24. Then, on July 18, 2013, Herold wrote up these incidents, but the written statement he prepared contradicted what he told Columbus on July 16. Id. Guerra never specifies how the written statement was inconsistent with what Herold told Columbus on July 16. Indeed, Guerra never describes the content of either the written statement or the conversation. On July 17, 2013, Guerra had a meeting with Tim Ostrowski (the president of the union), Herold, and Gibbs (who, in addition being a supervisor, was a union shop steward), to address Guerra's issues with Frasco. Id. ¶ 25.

On October 9, 2013, after receiving a "bad evaluation," Guerra filed a grievance against Herold. Id. ¶ 26. The evaluation stated that Guerra "lacked communication skills and did not

---

[2]  It is unclear from the Amended Complaint whether the keys opened the door to Herold's or Guerra's office.

maintain facilities and equipment." Id. Herold also claimed that Guerra was responsible for a missing chainsaw. Id. To Guerra's knowledge, Herold had never said that Oddy or Hurry was responsible for missing property. Id.

On November 22, 2013, Guerra "arrived at his office to find that someone had written 'SPIC' in large letters all over his office door." Id. ¶ 27. When Guerra discovered the graffiti, his staff was with him, which exacerbated his distress. Id. Guerra got in touch with Herold, who called security. Id. "Security simply questioned Mr. Guerra as if he had painted the door himself." Id. Guerra states that there is no evidence the investigation into the incident involved anything more than questioning him. Id. Herold removed the paint without giving an opportunity to match it "with other cans of paint in the possession of other employees." Id.

On September 30, 2014, Guerra was in the break room. Id. ¶ 28. He then exited the room, at which point Oddy replaced Guerra's chair with a broken one. Id. The Amended Complaint does not elaborate on this incident, and it is not clear whether Guerra attempted to sit in the chair or whether he noticed before he tried to sit down that the chair was broken. In any event, to Guerra's knowledge, Oddy had never engaged in such conduct with Hurry. Id.

Guerra filed a complaint with the Equal Employment Opportunity ("EEO") office at the Watervliet Arsenal on August 30, 2012, id. ¶ 4, and since that time "his work evaluations have all been negative," id. ¶ 29. One evaluation, which covered the period between August 27, 2011, and August 26, 2012, noted that Guerra "lacked communication . . . and people skills." Id. Another evaluation covering the period between August 27, 2012, and August 26, 2013, again said Guerra lacked communication and people skills in addition to noting that he "was no longer responsible or dependable." Id. Before he filed the EEO complaint, Guerra "had always received

positive work evaluations and there was never any indication that he was not performing his work duties satisfactorily." Id.

Guerra alleges that on January 5, 2014, he was constructively discharged because he could no longer deal with the purportedly hostile work environment he had been experiencing. Id. ¶ 30. He therefore resigned and "accept[ed] another position at a lower pay grade." Id.

### B. Procedural History

As noted above, on August 30, 2012, Guerra filed a complaint with the Watervliet EEO office alleging discriminatory conduct on the part of his employer. Id. ¶ 4. Guerra filed an amended complaint with the Equal Employment Opportunity Commission New York District Office on November 22, 2013. Id. ¶ 5. Guerra amended his complaint yet again on December 19, 2013. Id. ¶ 6. On June 16, 2015, the Department of the Army issued a decision on Guerra's complaint, noting that his prior attorney had expressed an intention to "withdraw the EEO complaint from the administrative process with the intent of filing a [civil] action." Id. ¶ 7. The decision also gave Guerra a right to file a civil action under Title VII within ninety days of his receipt of the decision. Id. Guerra did not receive the decision until at least July 2, 2015. Id.

Guerra filed his Complaint on September 28, 2015. Compl. After receiving leave of the Court, Guerra filed an Amended Complaint on June 30, 2016. Dkt. No. 14; Am. Compl. The Amended Complaint sets forth three causes of action under Title VII. Am. Compl. ¶¶ 31–46. First, Guerra claims that his employer created a hostile work environment on account of his race and national origin. Id. ¶¶ 31–37. Second, he argues that he was subjected to disparate treatment by his employer because of his race and national origin. Id. ¶¶ 38–39. Third, he claims that his employer retaliated against him for filing the EEO complaint. Id. ¶¶ 41–46.

On August 12, 2016, Murphy moved to dismiss the Amended Complaint for failing to state a claim upon which relief may be granted. Mot. Murphy argues that Guerra has failed to demonstrate that he experienced an adverse employment action as required under Title VII, and that, in any event, Guerra cannot show that any adverse employment actions he may have experienced give rise to an inference of discriminatory intent on the part of his employer. Mem. at 10. Murphy also suggests that Guerra's claims relating to the period before May 31, 2012, must be dismissed as untimely. Id. at 7–8. Finally, Murphy argues that Guerra has failed to establish a hostile work environment. Id. at 17–19. Guerra filed a Response, Resp., and Murphy filed a reply, Reply.

## III.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer

more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

## IV.   DISCUSSION

### A.  Disparate Treatment

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In an employment discrimination action, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–10 (1993). This initial burden is "minimal." Id. at 506.

In order to set forth a prima facie case of disparate treatment in violation of Title VII, a plaintiff must allege that: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Once the plaintiff satisfies her initial burden, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the defendant provides a legitimate, nondiscriminatory reason for the action, "the presumption raised by the prima facie case is rebutted and drops from the case." St. Mary's, 509 U.S. at 507 (internal citations omitted).

A complaint alleging employment discrimination is subject to a "lowered standard of review . . . at the motion to dismiss stage." Ingrassia v. Health & Hosp. Corp., 130 F. Supp. 3d 709, 719 (E.D.N.Y. 2015). "[A] discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss," but "it must at a minimum assert nonconclusory factual matter sufficient to [render its claims plausible]." EEOC v. Port Auth. of N.Y & N.J., 768 F.3d 247, 254 (2d Cir. 2014). In particular, "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015).

Murphy argues that Guerra's disparate-treatment claim must be dismissed because he fails to allege facts suggesting that he suffered an adverse employment action. Mem. at 11. In this circuit, an adverse employment action is a "'materially adverse change' in the terms and conditions of employment." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). A change in the terms and conditions of employment is not materially adverse unless it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Sanders v. N.Y.C. Human Rights Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)). "Examples of such a change include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Terry, 336 F.3d at 138). "[E]xcessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions

unless such conduct is 'accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss.'" Opoku v. Brega, No. 15-CV-2213, 2016 WL 5720807, at *7 (S.D.N.Y. Sept. 30, 2016) (quoting Siddiqi v. N.Y.C. Health & Hosp. Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008)).

Guerra's disparate-treatment claim must be dismissed because he fails to allege that he experienced any adverse employment actions. A significant portion of Guerra's Amended Complaint is devoted to outlining incidents in which supervisors or coworkers yelled at or reprimanded him. Am. Compl. ¶¶ 12, 17, 18, 21–23. These incidents, while undoubtedly unpleasant for Guerra, fail to rise to the level of materially adverse changes in the terms or conditions of his employment. That is because there is no indication that they led to any tangible consequences related to Guerra's position at the Arsenal. See, e.g., Barounis v. N.Y.C. Police Dep't, No. 10-CV-2631, 2012 WL 6194190, at *12 (S.D.N.Y. Dec. 12, 2012) ("Although [the plaintiff] has offered proof that [his supervisors] were hostile to him by yelling at him in front of co-workers and giving him a hard time[,] . . . this is not an adverse employment action."); Katz v. Beth Israel Med. Ctr., No. 95-CV-7183, 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) ("Being yelled at [and] receiving unfair criticism . . . do not rise to the level of adverse employment actions [because] they do not affect any ultimate employment decisions."). Guerra also fails to allege any impact on his job resulting from Oddy's replacing his chair in the break room with a broken one. Am. Compl. ¶ 28.

Herold refused to give Guerra keys to either Guerra's or Herold's office (as noted above, it is unclear from the Amended Complaint whose office the keys were for). Id. ¶ 20. While that may have been inconvenient for Guerra, it is insufficiently serious to constitute an adverse

employment action. See Waheed v. SUNY Brooklyn Educ. Opportunity Ctr., No. 04-CV-5630, 2007 WL 2126092, at *6 (E.D.N.Y. July 24, 2007) ("[A]s a matter of law, a denial of keys to the office . . . [is] not [an] adverse employment action[].""). Guerra fails to allege that not having keys to his office affected his job in any tangible way, which gives further reason to conclude that this conduct is not an adverse employment action. See Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 354 (S.D.N.Y. 2006) ("[A]s a matter of law, the failure to promptly provide a replacement key [to the laboratory where Plaintiff worked] did not cause a materially adverse change to Plaintiff's employment, particularly where the absence of a key did not prevent her from working.").

Guerra alleges that on multiple occasions, his authority as a "work leader" was disregarded. Am. Compl. ¶¶ 13, 16. This allegation is quite vague. Guerra does not allege facts enabling the Court to see how his status as a work leader affected the conditions of his employment. Guerra further fails to point to any concrete consequences flowing from the failure to recognize him as a work leader. At best, then, this allegation involves a "mere inconvenience" to Guerra. Sanders, 361 F.3d at 755 (quoting Terry, 336 F.3d at 138). Equally vague is Guerra's allegation that Herold never allowed him to create service orders. Am. Compl. ¶ 19. Guerra does not say whether creating service orders was an important part of his job, or indeed whether it was something his job required him to do at all. Even assuming that Guerra had alleged that creating service orders was one of his responsibilities as an Arsenal employee, denial of the ability to make the orders, without an indication that such an ability was crucial to his job, would not suggest the kind of "significantly diminished material responsibilities" necessary to show an adverse employment action. Sanders, 361 F.3d at 755 (quoting Terry, 336 F.3d at 138).

Herold told Guerra at a meeting that he should perhaps consider changing careers, Am. Compl. ¶ 15, but that is also insufficient to constitute an adverse employment action, see Katz, 2001 WL 11064, at *14 (finding that the plaintiff's "being told to retire" if she did not like certain schedule changes does not constitute an adverse employment action). Again, Guerra does not allege that Herold's suggestion affected his job responsibilities in any tangible way. Equally unavailing is Guerra's allegation that Herold failed to adequately respond to his email regarding issues he had been having with Oddy and Orologio. Am. Compl. ¶ 14. "Supervisory inaction" is typically insufficient to establish an adverse employment action, Sesay-Harrell v. N.Y.C. Dep't of Homeless Servs., No. 12-CV-925, 2013 WL 6244158, at *14–15 (S.D.N.Y. Dec. 2, 2013), and since Guerra does allege any adverse consequences resulting from Herold's inaction, there is no reason to make an exception to this general principle here. The same is true for Guerra's allegations regarding Herold's inconsistent statements about the incidents in which Frasco cursed at Guerra. Am. Compl. ¶ 24. Further, to the extent that Guerra alleges he was falsely accused of being responsible for a missing chainsaw, id. ¶ 26, that accusation cannot constitute an adverse employment action, see Roff v. Low Surgical & Med. Supply, Inc., No. 03-CV-3655, 2004 WL 5544995, at *7 (E.D.N.Y. May 11, 2004) ("Plaintiff's allegation that she was falsely accused of speaking to a patient, absent any indication that the accusation resulted in a material loss of benefits, a demotion, significantly diminished responsibilities, or other materially adverse employment consequence, does not constitute an adverse employment action.").

Guerra alleges that he received negative evaluations in 2012 and 2013. Am. Compl. ¶ 29. Guerra did not include these evaluations in his Amended Complaint, but Murphy attached them as exhibits to his Motion. Dkt. Nos. 20-8 ("Exhibit E"), 20-9 ("Exhibit F"). "Even where a

document is not incorporated by reference [in a complaint], the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (quoting <u>Int'l Audiotex Network, Inc. v. Am. Tel. & Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). But documents outside the complaint may not be considered in deciding whether to dismiss it unless there is no dispute as to their accuracy or relevance. <u>Faulkner v. Beer</u>, 463 F.3d 130, 134 (2d Cir. 2006). The allegedly negative evaluations are integral to Guerra's Amended Complaint because he relies on them to establish that he suffered an adverse employment action, one of the elements of a prima facie case of discrimination under Title VII. Further, Guerra does not dispute their accuracy or relevance. Thus, the Court will consider them in determining whether he suffered an adverse employment action.

An examination of these performance evaluations reveals that they are not actually negative. In fact, they are positive. The 2012 evaluation gave Guerra a one out of five for overall performance, the highest possible score. Ex. E at 146. Some of the comments included "Very reliable employee" and "Very dedicated," in addition to "Good employee" and "Willing to help others." <u>Id.</u> at 145–46. Indeed, the only negative comment was that Guerra had had "[r]ecent issues with his employees [that] cause concern regarding . . . supporting team, respecting others and communicating/expressing ideas clearly." <u>Id.</u> at 146. But this comment was made under the "Working Relationships & Communications" heading, and the overall rating for this category was "SUCCESS (Meets std)." <u>Id.</u> Guerra's overall score on the 2013 evaluation was two out of five, one point lower than his score on the 2012 evaluation. Ex. F at 2. Yet that score made Guerra a "successful" employee, and comments in the evaluation bear this out. <u>Id.</u> Again, Guerra

was described as a "[g]ood employee" who was "[w]illing to help others," id., and yet again he was praised for being reliable and dedicated, id. at 1. Echoing the 2012 evaluation, the 2013 evaluation did contain some criticism related to Guerra's communication skills, but he was still found to be successful overall in this area. Id. at 2. Thus, it is inaccurate to describe the evaluations referred to in Guerra's Amended Complaint as negative. See Deberry v. Brookdale Univ. Hosp. & Med. Ctr., No. 12-CV-6251, 2016 WL 3840673, at *7 (E.D.N.Y. July 12, 2016) ("[C]ontrary to her characterization, Plaintiff's 'performance evaluations' were not 'negative' but generally positive.").

Even if the Court accepted Guerra's misleading characterization of the evaluations as negative, he would still be unable to establish an adverse employment action. Generally, "negative performance evaluations or ratings . . . do not constitute adverse employment actions." Herling v. N.Y.C. Dep't of Educ., No. 13-CV-5287, 2014 WL 1621966, at *6 (E.D.N.Y. Apr. 23, 2014). Negative evaluations must be accompanied by an "adverse result such as demotion, diminution of wages, or other tangible loss" in order to be considered adverse employment actions in the discrimination context. Browne v. City Univ. of N.Y., 419 F. Supp. 2d 315, 332 (E.D.N.Y. 2005). Guerra fails to allege that the supposedly negative evaluations he received in 2012 or 2013 had any adverse results relating to his position at the Arsenal. Indeed, he fails to make even the "conclusory assertion" that it affected his employment that courts have regularly found insufficient to establish an adverse employment action stemming from a negative evaluation. Id. (collecting cases).[3]

_____

[3] Guerra relies on Preda v. Nissho Iwai American Corp., 128 F.3d 789 (2d Cir. 1997), to support his claim that he suffered an adverse employment action. Resp. at 15. That reliance is misplaced. In Preda, the plaintiff alleged that he had been excluded from departmental meetings

14

The only remaining allegation relevant to the issue of adverse employment actions in the disparate-treatment context is that someone painted the word "SPIC" on Guerra's door. Am. Compl. ¶ 27. The Court considers that conduct below in relation to Guerra's hostile work environment claim. Since the Court concludes that Guerra fails to state a hostile work environment claim because the incident involving his door fails to rise to the level of an adverse employment action, the Court need not consider that incident in connection with the disparate-treatment claim. See Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (noting that, as is the case with a disparate-treatment claim, a hostile work environment does not exist absent a change in the terms and conditions of the plaintiff's employment). Accordingly, the disparate-treatment claim must be dismissed.

**B. Hostile Work Environment**

To state a hostile work environment claim, a plaintiff must first demonstrate that she experienced harassment "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Alfano, 294 F.3d at 373 (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). The plaintiff must also show "that a specific basis exists for imputing the objectionable conduct to the employer." Id. A hostile work environment claim has "objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Id. at 374 (quoting

_____

and outings with clients, and that while he had devoted significant effort to "working on Eastern European business development," he was later relegated to performing "largely clerical" tasks. Id. at 790. Unlike Guerra's allegations, which do not suggest any tangible alteration of Guerra's position at the Arsenal, the actions described in Preda had a significant effect on the plaintiff's job responsibilities.

15

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In evaluating a hostile work environment claim, a court may not consider incidents unrelated to the plaintiff's protected characteristics. Daniel v. T & M Prot. Res. LLC, 87 F. Supp. 3d 621, 634 (S.D.N.Y. 2015); see also Alfano, 294 F.3d at 374 (finding that it is well established that in order to state a "sex-based hostile work environment [claim] under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex").

The Second Circuit has held that "racist comments, slurs, and jokes" do not create a hostile work environment unless there are "more than a few isolated incidents of racial enmity." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)). "Sporadic racial slurs" are insufficient, and a plaintiff must instead demonstrate "a steady barrage of opprobrious racial comments." Id. (quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)). Somewhat in tension with this line of cases, the Second Circuit has held that "a hostile work environment can also be established through evidence of a single incident of harassment that is 'extraordinarily severe.'" Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 724 (2d Cir. 2010) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)). The Second Circuit appears to have reconciled these two lines of cases as follows: a single incident of harassment does not suffice to state a hostile work environment claim unless "by itself, it can and does work a transformation of the plaintiff's workplace." Alfano, 294 F.3d at 374; accord Miller v. Praxair, Inc., 408 F. App'x 408, 411 (2d Cir. 2010) (finding that a few isolated incidents involving racially offensive language were insufficient to state a hostile work environment claim because they did not transform the plaintiff's workplace). For example, in Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir.

2000), the plaintiff, a female firefighter, experienced a single instance of harassment. At a gathering attended by her and a large group of her male coworkers, one of her subordinates suggested that, among other things, she "had gained her office of lieutenant only by performing fellatio." Id. The court decided not to dismiss the hostile work environment claim even though it involved only one incident on the ground that this incident worked a transformation in the plaintiff's workplace:

> It cannot be concluded as a matter of law that no rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of [plaintiff's] working conditions: In an occupation whose success in preserving life and property often depends on firefighters' unquestioning execution of line-of-command orders in emergency situations, the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, of diminishing the respect accorded the officer by subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters.

Id.; see also Thomas v. N.Y.C. Health & Hosps. Corp., No. 02-CV-5159, 2004 WL 1962074, at *12–13 (S.D.N.Y. Sept. 2, 2004) ("Cases construing hostile work environment claims have distinguished Howley on its facts, and in particular on its reliance on the adverse impact of the incident on the plaintiff's ability to lead.").

At the outset, the only incident alleged by Guerra that has any connection to his status as a Hispanic person of Cuban ancestry is the painting of his door with the word "SPIC." Since the other incidents appear to be unrelated to Guerra's protected characteristics, they "must be removed from consideration" in evaluating his hostile work environment claim. Alfano, 294 F.3d at 377. Thus, the Court faces the question whether the single incident of someone painting

"SPIC" on Guerra's door is sufficient to state a hostile work environment claim. The answer to that question is no.

As noted above, Guerra "arrived at his office to find that someone had written 'SPIC' in large letters all over his office door." Am. Compl. ¶ 27. Guerra was particularly humiliated by this because "at the time his staff was with him." Id. Guerra alleges that he called Herold, who in turn called security, and that security simply questioned Guerra without seeming to engage in any further investigation. Id. Herold then removed the paint before it could be matched with paint belonging to other employees. Id. While this incident involved despicable conduct warranting the strongest possible condemnation, Guerra does not allege any other incidents involving racially offensive language. Thus, Guerra experienced "a[n] . . . isolated incident[] of racial enmity," Schwapp, 118 F.3d at 110 (quoting Snell, 782 F.2d at 1103), which is typically insufficient to state a hostile work environment claim, Pagan v. N.Y.S. Div. of Parole, No. 98-CV-5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (collecting cases). Further, Guerra fails to allege facts showing that this incident "by itself . . .  work[ed] a transformation of [his] workplace." Alfano, 294 F.3d at 374. Unlike in Howley, here there is no indication that Guerra's standing in the workplace was compromised by the incident, or that it had any tangible impact on the conditions of his employment. Instead, Guerra conclusorily asserts that he was made to endure a hostile work environment. Am. Compl. ¶ 30. Thus, this deeply troubling incident does not suffice to create a hostile work environment. See Jones v. Dallas County, 47 F. Supp. 3d 469, 488 (N.D. Tex. 2014) ("Although courts have determined that the presence of racist graffiti could be sufficient to create a hostile work environment, they generally have done so when the graffiti is

extensive, is combined with other harassing conduct, or contains threatening language."). Accordingly, Guerra's hostile work environment claim must be dismissed.[4]

## C. Retaliation

Under Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e–3(a). "To establish a prima facie case of retaliation, an employee must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" Terry, 336 F.3d at 141 (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)). "The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." Id.; see also Burlington N., 548 U.S. at 64 ("[T]he antiretaliation

---

[4] To the extent that Guerra advances a constructive discharge claim, Am. Compl. ¶ 30, dismissal of the hostile work environment claim entails dismissal of that claim as well. Vazquez-Bonilla v. United Union of Roofers Local 8, No. 08-CV-0101, 2010 WL 1005905, at *8 (E.D.N.Y. Mar. 17, 2010) ("[B]ecause a hostile work environment is a necessary predicate to a constructive discharge claim, th[e] failure [to assert a viable hostile work environment claim] is similarly fatal to that related claim."); see also Pa. State Police v. Suders, 542 U.S. 129, 146 (2004) ("The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment.").

provision, unlike the substantive provision [forbidding discrimination], is not limited to discriminatory actions that affect the terms and conditions of employment.").

Guerra alleges that his employer retaliated against him in violation of Title VII by giving him negative performance evaluations after he filed his EEO complaint. Am. Compl. ¶ 45. Unlike in the discrimination context, where negative evaluations standing alone do not constitute adverse employment actions, "receipt of a negative performance review constitutes an 'adverse action' for purposes of a retaliation claim." Cerni v. J.P. Morgan Sec. LLC, No. 15-CV-5389, 2016 WL 5805300, at *3 (S.D.N.Y. Sept. 20, 2016) (citing Vega, 801 F.3d at 91). The problem for Guerra is that, as discussed above, it is simply inaccurate to describe the performance evaluations he received in 2012 and 2013 as negative. See Exs. E, F. Instead, they were positive. Guerra cannot show that he experienced an adverse employment action for purposes of stating a retaliation claim. Thus, his retaliation claim must be dismissed.[5]

V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Murphy's Motion to Dismiss (Dkt. No. 20) is **GRANTED** and Guerra's Amended Complaint (Dkt. No. 15) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve copies of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

---

[5] Because the Court dismisses the Amended Complaint in its entirety on the grounds discussed above, it need not reach Murphy's arguments that parts of Guerra's Amended Complaint are time-barred and that Guerra has failed to allege facts suggesting discriminatory intent. Mem. at 7–8, 14–16.

**IT IS SO ORDERED.**

DATED:      December 29, 2016
               Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge